J-S53023-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
MICHAEL ALEXANDER :
:
Appellant : No. 543 EDA 2020

Appeal from the Judgment of Sentence Entered November 15, 2019
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0001033-2019

BEFORE: SHOGAN, J., LAZARUS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.: **FILED: FEBRUARY 22, 2021**

Michael Alexander appeals from the judgment of sentence, entered in

the Court of Common Pleas of Lehigh County, following his convictions for

stalking[1] and harassment.[2] After careful review, we affirm.

The trial court set forth the facts of the case as follows:

[T.B.], the victim, met [Alexander] through an online dating
[service] called Plenty of Fish (POF) in January of 2018 and they
became romantically involved. [T.B.] is a mental health
technician at Lehigh Valley Hospital - Muhlenberg campus. At all
times relevant to this case, [T.B.] worked in the Behavioral Health
building [and] was a nursing student attending Northampton
Community [C]ollege. [T.B.] lived in Easton with her ten-year-old
son. The [child]'s [father] is Robert Cherry-Alexander[,] who has
no relationship to the [d]efendant.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2709.1(a)(1).

[2] 18 Pa.C.S.A. § 2709(a)(4).

Initially, [T.B.] communicated with [Alexander] electronically through [POF] and through video chat. Sometime in February or March of 2018, she first met [Alexander] in-person in Pottstown[,] where he resided. Depending on her work and school schedule, [T.B.] would visit [Alexander] in Pottstown a couple of times [each] month. In June of 2018[,] they briefly stopped talking, but resumed their relationship at the end of July [of 2018]. [T.B.] described [Alexander] as charming, but as time went on[,] she began to notice a change in [his] behavior. In early October [of 2018,] an incident occurred while [T.B.] was visiting [Alexander] that changed their relationship.

[On] September [30, 2018], [T.B.] went to see [Alexander] at his residence in Pottstown. [O]n October 1, 2018, [Alexander] wanted a sexual favor. [T.B] had to leave for school or she would be late. [T.B.] rejected [Alexander's] advances and he became angry. [Alexander] began to throw things around his apartment, pinned [T.B.] to the floor, and threatened to throw her [o]ut of his fifth[-]story window. [T.B.] testified that she was eventually able to get away. After the incident, she informed [Alexander] on multiple occasions not to contact her.

Shortly after the [October 1, 2018] incident, [T.B.] received messages from [Alexander] including voicemails to her phone and photos on Facebook. [T.B.] construed the voicemails and photos as threats and contacted police. On October 9, 2018, [T.B.] obtained a temporary Protection from Abuse Order (PFA) in Northampton County. A final PFA was issued for a period of 3 years on November 9[,] 2018. [However], [Alexander] was not properly served with the final PFA until his arrest in February of 2019. [Alexander] testified that he was aware of the temporary order and made reference to the no[-]contact orders in his messages with the victim.

Nevertheless, [Alexander] continued to contact [T.B.] in spite of the no[-]contact order. By December of 2018, [Alexander] had reached out to [T.B.] on multiple occasions. [Alexander] deviously created different Facebook profiles to contact [T.B.] through [the] Facebook Messenger Service. This service allowed [Alexander] to hide his identity and send messages through fictitious profiles that he created. However, [T.B.] testified that she realized it was [Alexander] attempting [to] contact her when she opened the message. [T.B.] admitted she responded to some messages in an attempt to be civil or reinforce that she did not want contact with [Alexander].

- 2 -

The fake profiles [Alexander] used to contact [T.B.] were extensively reviewed by [T.B.] during trial. First, [T.B.] discussed threats from profile "Alan Shooter." [T.B.] testified that she was concerned for her safety and that of her family. [T.B.] also received concerning messages from Facebook profile "Alex Ryan." Finally, [T.B.] discussed messages from a deleted profile name. [T.B.] knew the fake profiles were [Alexander,] as the content related to their relationship. For instance, [Alexander] directly informed [T.B.,] "it's Michael[,]" [and sent a] message[ saying] "stop blocking me[.]" [He also] threaten[ed] that [T.B.] was "getting a visit, soon anyway" [and said] "call me, I'm on a rampage."

During the course of the trial, [T.B] and [] Cherry-Alexander[] testified that they were disturbed by the nature and extent of the messages. [] Cherry-Alexander and [T.B] had been separated for approximately five years. [] Cherry-Alexander began receiving text messages from [Alexander] that disturbed him. [Alexander] threatened to "to slice [T.B.'s] [] face open," [and] made reference to harming Cherry-Alexander and kidnaping [his and T.B.'s] child. In response, at some point, [] Cherry-Alexander moved in with [T.B.] out of concern for her and their child's safety. [Alexander's] conduct escalated. He sent [T.B.] photographs of her apartment building, her family members, and firearms. In February of 2019, [Alexander] attempted to surprise [T.B.] at work.

On February 27, 2019, around 7 a.m.[, at the time when T.B.'s work shift usually ended, Alexander] went to [Lehigh Valley Hospital] and [] sent [T.B.] two videos which depicted him [there on the Muhlenberg campus.] Fortunately, [T.B.] was not on site. When [T.B.] arrived at work later that evening[,] she reported the incident to hospital security and police were contacted.

[Alexander] also attempted to find out more information on how to access the Behavioral Health Unit where [T.B.] worked. [Alexander] first placed a call[,] which was recorded through hospital standard procedures[, in which he] inquired about nurse shift changes in an effort to discover when he would have an opportunity to catch [T.B.]. [Alexander] placed [an] additional call[] and eventually spoke with Linda McCarthy, an administrative partner, who testified that [her phone] conversation [with Alexander] was especially concerning to her.

On February 27, 2019, police obtained a warrant to arrest [Alexander] for stalking and harassment. [Police took Alexander] into custody in Pottstown, Pennsylvania. During [Alexander's] transport[,] he made several unsolicited comments acknowledging that he was aware of the PFA order, he was going to grind [T.B.] up in court, and that he needed to correct [T.B]'s behaviors. An audio and video recording of the transport was played for the [c]ourt.

[Alexander] took the stand to testify in his defense. [He] first attempted to explain to the [c]ourt that he had a specific purpose in visiting [T.B.] when he went to [Lehigh Valley H]ospital[ on February 27, 2019]. [Alexander] informed the [c]ourt he was agitated with [T.B.] and wanted to see her "to get things established." According to Alexander, [T.B] was not contacting him back, yet [he also testified that] she was contacting him regardless of the PFA. [Alexander] testified that[,] although he knew about the temporary PFA order[,] he was never served notice of the final order.

[Alexander] further attempted to explain his understanding of the issues in the case. [Alexander] took particular issue with what he deemed to be "[T.B.]'s lies." [T.B.] was living with [Cherry-Alexander,] unbeknownst to [Alexander]. The time[-]frame of these events is not clear. [Alexander] thought that [T.B.] was a "good girl" but he wasn't aware of "these flaws about her." [Alexander] testified that [T.B.] "basically turned her back on a good guy, and [he] was the good guy in the picture trying to help her." [Alexander] stated he had every right to be upset with [T.B.]. [Alexander] took [T.B.] in, gave her a chance, and thought maybe he could "change her."

Cross-examination further exemplified the factual inconsistences raised by [Alexander]. First, [he] admitted that he was never invited to [T.B.'s] residence[.] However, [Alexander] testified that [T.B.] wanted him to live with her. [Alexander] acknowledged that [T.B.] never introduced her [child] to him but specified that she wanted him closer to be in her [child]'s life. [Alexander] stated that he never laid hands on [T.B.], particularly during the [October 1, 2018] incident at his apartment, but then admitted she was injured after he had "pinned—put her on the floor." [Alexander] testified that he never threatened to throw [T.B.] out the window[,] but then admitted he told [] Cherry-Alexander that he should have thrown her out the window.

[Alexander] did not deny or dispute any of the evidence. [Alexander] admitted all of his behavior[; he] acknowledged that he sent the messages, made the phone calls, and attempted to catch [T.B.] at work.

Trial Court Opinion, 1/22/20, at 3-8 (internal citations, subheadings, and footnotes omitted).

At the conclusion of trial, the court convicted Alexander of stalking and harassment, and granted Alexander's motion for judgment of acquittal on the terroristic threats case.[3]  On November 15, 2019, the court sentenced Alexander to 2½ to 5 years' incarceration for stalking, with no further penalty for harassment.  On November 25, 2019, Alexander filed a timely post-sentence motion, which the court denied on January 22, 2020.  Alexander filed a notice of appeal on February 13, 2020; both he and the trial court have complied with Pa.R.A.P. 1925.

---

[3] When dismissing the terroristic threats charge against Alexander, the court noted that it was not for Alexander's lack of threats against T.B. or Cherry-Alexander, but rather, was due to a deficiency in the Commonwealth's charging document:

Well, frankly, I think it's an unfortunate situation of an information that is crafted with a very narrow allegation.  Do I think that threats have been conveyed to [T.B.]?  Yes, I do, from the testimony that I've heard so far.  I think that they've been communicated to her directly, as well as to [Cherry-Alexander]. I just don't think that these are the ones that win the day.  So given the fact that the information specifically refers to the communications in the police vehicle, I'm going to grant [Alexander's] motion, and [] dismiss [the terroristic threats charge].

N.T. Nonjury Trial, 10/2/19, at 191.

On appeal, Alexander raises the following issues for our review:

1. Was the verdict against the weight of all the evidence in regards to the proof of whether or not [Alexander had] the necessary criminal intent to commit the crime of stalking?

2. Whether the [trial] court abused its discretion in imposing a manifestly excessive and unreasonable sentence for the stalking charge[,] which is at the statutory maximum limit[,] when the court failed to consider any significant mitigating factors, failed to [] apply and review any of the necessary factors as set forth in 42 Pa.C.S.A. § 9721(b) and 42 Pa.C.S.A. §[§] 9781(c) and (d) or otherwise failed to set forth appropriate reasons for its deviation from the standard ranges[,] and sentenced [Alexander] based upon the court's perceived belief as to the seriousness of the crime and factors that were already considered in the calculation of the appropriate sentencing guidelines?

Appellant's Brief, at 7-8 (unnecessary capitalization omitted).

Alexander first challenges the weight of the evidence, claiming that it "contradicts a determination that he acted intending to put [T.B.] in reasonable fear of bodily injury or that he intended to cause [her] substantial emotional distress." *Id.* at 12-15. Alexander claims that his actions were not criminal, but rather, amounted to a "misguided romantic interest in [T.B], which was undoubtedly questionable and not reciprocated[.]" *Id.* at 12. Indeed, Alexander's defense at trial was that his actions were justifiable as an attempt to "rekindle [his] relationship [with T.B.] and straighten out whatever differences had [come] between them." *Id.* at 13. Alexander relies on the fact that T.B. still responded to his messages, even after the PFA was in effect, which confirmed his belief that the relationship was still "salvageable." *Id.* at 14.

Our standard of review for a challenge to the weight of the evidence is well-settled:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the [trial] court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.
>
> The scope of a trial court's discretion to address a post-verdict weight claim is not whether the court would have decided the case in the same way but whether the verdict is so contrary to the evidence as to make the award of a new trial imperative to give right another opportunity to prevail. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. When the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion. Our Supreme Court has repeatedly emphasized[ that the trial court's conviction that the verdict was or was not against the weight of the evidence is o]ne of the least assailable reasons for granting or denying a new trial.

*Commonwealth v. Forbes*, 867 A.2d 1268, 289 (Pa. Super. 2005) (internal citations and quotation marks omitted).[4]

The court convicted Alexander of stalking under subsection 2709.1(a)(1), which defines the offense as follows:

_____

[4] Alexander properly preserved his weight of the evidence claim in his post-sentence motion. *See* Pa.R.Crim.P. 607(A).

A person commits the crime of stalking when the person . . . engages in a course of conduct or repeatedly commits acts toward another person, including following the person without proper authority, under circumstances which demonstrate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person[.]

18 Pa.C.S.A. § 2709.1(a)(1).

Here, the trial court found that Alexander's actions amounted to "the very definition of stalking and harassment."  Trial Court Opinion, 1/22/20, at 10.  The court addressed the issue specifically as follows:

[T.B. testified] credibl[y] and [Alexander] does not deny any of the conduct or evidence produced by the Commonwealth.

The evidence at trial revealed that [Alexander] engaged in a course of conduct under circumstances that caused substantial emotional distress to [T.B.].  [T.B.] attempted to resolve the situation with a [PFA] but [Alexander] ignored [it].  [Alexander]'s conduct escalated and [T.B.] testified that she was in fear for her safety.  Even [Cherry-Alexander] felt the need to intervene and moved into the family home.

[T.B.]'s attempts to placate [Alexander] with a response w[ere] surely appropriate gestures [] to keep the peace.  [T.B.] testified she was attempting to be civil with [Alexander] because she was afraid of what he might do.  One does not purposely *poke the tiger*.  [Alexander]'s conduct was clearly egregious and threatening, and therefore, not a result of a simple give-and-take relationship.  [Alexander] followed [T.B.] without proper authority, sent her messages and pictures that would [be of] concern [to] any recipient, made inappropriate references to her family and children, and casually referenced violence through threats and firearms.  [T.B.] appropriately sought legal intervention[,] which [Alexander] disregarded.  The [c]ourt finds the fear was certainly reasonable under the circumstances and notes that such actions would cause any reasonable person substantial emotional distress.

*Id.* at 9-10 (emphasis in original).

Here, T.B. was subject to zealous cross-examination, and Alexander testified in his own defense. The Honorable Kelly L. Banach, sitting as fact-finder, ultimately believed T.B.'s testimony and disbelieved Alexander's defense. *See Commonwealth v. Palo*, 24 A.3d 1050, 1055 (Pa. Super. 2011) ("The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses."). After our review of the record, we cannot say that the trial court abused its discretion in determining the verdict was not so contrary to the evidence as to shock one's sense of justice.[5] *See Forbes*, *supra*.

Moreover, Alexander's characterization of T.B.'s responses to his messages as a sign that their relationship was "salvageable" is contradicted in his own appellate brief, in which he concedes that "[Alexander's] romantic interest in [T.B.] . . . was . . . **not** reciprocated." Appellant's Brief, at 12 (emphasis added). Alexander cites **no specific messages whatsoever** to support his claim of reciprocal romantic interest, or even minimal acceptance of Alexander's violation of the no-contact order contained within the PFA, likely because there are none. *See* N.T. Nonjury Trial, 10/2/19, at 66-67 ("Q. Okay.

_____

[5] Our review of the record reveals that Alexander's messages to T.B. were too numerous to even estimate reliably. *See* N.T. Nonjury Trial, 10/2/19, at 40 ("There were so many. I couldn't screenshot a million messages, I mean, but I tried to screenshot what I felt was very important to report. . . . I can't clearly print out a thousand messages."). The messages of record can only be described as a barrage of threats and insults directed at T.B. and her family members; we agree with the trial court that Alexander's "messages and pictures [] would concern any recipient . . . [and T.B.] appropriately sought legal intervention[,] which [Alexander] disregarded." Trial Court Opinion, 1/22/20, at 10.

- 9 -

Why did you not choose to screenshot messages that you sent back to []
Alexander? A. Because th[e] messages [in the record] are from the week of
him showing up at my place of employment [in February]. . . . If I did respond
[to any of his messages], it was between December and January."). Indeed,
the trial court credited T.B.'s testimony that any replies she may have sent
Alexander were an attempt to "placate" him and "keep the peace." Trial Court
Opinion, 1/22/20, at 10. Contrary to Alexander's claims, the trial court's
credibility determinations are soundly supported by the record. *See* N.T.
Nonjury Trial, 10/2/19, at 40 ("Q. Did you ever respond to any of
[Alexander's] messages? A. Yes. If I did, [] I was saying things like, [] please
don't contact me, [] I will have to call the police[.] There were times where I
was making nice because at that point [Alexander] threatened to kidnap my
[child]. He would say things [like: ']I know what time your kid gets off the
bus, [] I know when you're going to class.[']"); *id.* at 65 ("Q. Okay. So would
it be fair to say that after October 1, 2018, you responded to [Alexander's]
messages that were sent via Facebook Messenger? A. Yes. Q. Was there
positive communication contained in your responses? A. The only time I was
ever positive was when I was trying to be civil because I wanted [Alexander]
to stop threatening me and stop threatening my family. Q. Would it be fair
to say you were not trying to rekindle romance after October the 1st? A. **No.
That was very clear.**") (emphasis added). Therefore, the trial court acted
within its discretion in denying Alexander's motion for a new trial on the

grounds that the verdict was against the weight of the evidence. *See Forbes*, *supra*.

Next, Alexander challenges the discretionary aspects of his sentence. We note that the right to appeal the discretionary aspects of one's sentence is not absolute; the jurisdiction of this Court must be properly invoked, which we evaluate via the following four-part test:

> (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, *see* Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. The determination of whether a particular issue raises a substantial question is to be evaluated on a case-by-case basis. Generally, however, in order to establish a substantial question, the appellant must show actions by the sentencing court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process.

*Commonwealth v. Dunphy*, 20 A.3d 1215, 1220-21 (Pa. Super. 2011) (some internal citations, quotations marks, and footnotes omitted).

Here, Alexander filed a post-sentence motion for reconsideration of his sentence, followed by a timely notice of appeal to this Court. He has also included in his brief a concise statement of reasons relied upon for allowance of appeal with respect to the discretionary aspects of his sentence, pursuant to Rule 2119(f). *See* Appellant's Brief, at 10. Accordingly, we must now determine whether Alexander has raised a substantial question that his sentence is not appropriate under the Sentencing Code.

We determine whether the appellant has raised a substantial question on a case-by-case basis. **Commonwealth v. Paul**, 925 A.2d 825, 828 (Pa. Super. 2007). "We cannot look beyond the statement of questions presented and the prefatory Rule 2119(f) statement to determine whether a substantial question exists." **Commonwealth v. Radecki**, 180 A.3d 441, 468 (Pa. Super. 2018) (brackets omitted).

In his Rule 2119(f) statement, Alexander states:

[T]he [s]entencing [c]ourt impose[d] a manifestly excessive sentence[,] which is the maximum sentence allowed by law[,] and[,] which was nearly double the standard range of the [s]entencing [g]uidelines as applied to [Alexander]. [T]he court [did not] adequately consider[] the necessary and appropriate factors[,] as set forth in the Sentencing Code[,] and [] the court overemphasized factors already considered in the guidelines to nonetheless increase the sentence to its maximum extent.

Appellant's Brief, at 10.

Generally, "a bald assertion that a sentence is excessive does not by itself raise a substantial question justifying this Court's review of the merits of the underlying claim." **Commonwealth v. Fisher**, 47 A.3d 155, 159 (Pa. Super. 2012). Additionally, "a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review." **Commonwealth v. Eline**, 940 A.2d 421, 435 (Pa. Super. 2007).

Nevertheless, we find that Alexander has raised two substantial questions for our review. First, a claim that a court imposed a sentence outside the guidelines while failing to consider mitigating circumstances has been found to raise a substantial question. **See Commonwealth v. Swope**,

123 A.3d 333, 340 (Pa. 2015) (holding claim of excessiveness coupled with claim trial court failed to consider rehabilitative needs and mitigating factors presents substantial question); **Commonwealth v. Samuel**, 102 A.3d 1001, 1007 (Pa. Super. 2014) (same). Second, a claim that the court double-counted a sentencing factor raises a substantial question. **See Commonwealth v. Goggins**, 748 A.2d 721, 732 (Pa. Super. 2000) ("double-counting" sentencing factor to justify imposition of sentence where same factor is already accounted for by sentencing guidelines amounts to abuse of discretion). Accordingly, we will review the merits of Alexander's claims.

Our standard of review is as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias[,] or ill will, or arrived at a manifestly unreasonable decision.

**Commonwealth v. Blount**, 207 A.3d 925, 934-35 (Pa. Super. 2017) (quoting **Commonwealth v. Zirkle**, 107 A.3d 127, 132 (Pa. Super. 2014)). Moreover, this Court's review of the discretionary aspects of a sentence is governed by 42 Pa.C.S.A. §§ 9781(c) and (d). **Commonwealth v. Dodge**, 77 A.3d 1263, 1274 (Pa. Super. 2013). Section 9781(c) reads:

(c) Determination on appeal.—The appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds:

* * *

- 13 -

(3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable.

In all other cases the appellate court shall affirm the sentence imposed by the sentencing court.

42 Pa.C.S.A. § 9781(c)(3). Subsection 9781(d) requires that, in reviewing the record, we consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant.

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

(3) The findings upon which the sentence was based.

(4) The guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d). Additionally, "[w]here pre-sentence reports exist, we shall continue to presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. A pre-sentence report constitutes the record and speaks for itself." *Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988).

Here, Alexander claims that the trial court abused its discretion because

there was no significant basis, legal or factual, given by the court to support the deviation in [Alexander's] sentence [from the sentencing guidelines,] and the [imposition of the maximum] allow[able] sentence. The [c]ourt [was] caught up in an unsubstantiated concern that [Alexander] might act in a violent manner or [was] otherwise [] uncontrollable by [] other [means] than the imposition of the longest sentence available. [Alexander]'s justifications fell on deaf ears[,] and there was little[,] if any[,] review of [Alexander's] need for therapy and treatment prior to the imposition of the sentence.

Appellant's Brief, at 17-18.

- 14 -

Here, in arguing an abuse of discretion, Alexander essentially asks this Court to re-weigh the sentencing factors presented to the sentencing court. *See* Appellant's Brief, at 18 ("[Alexander]'s justifications fell on deaf ears[.]"). This we cannot do. *See Commonwealth v. Griffin*, 804 A.2d 1, 9 (Pa. Super. 2002) (citing *Commonwealth v. Williams*, 562 A.2d 1385, 1388 (Pa. Super. 1989) (en banc) (allegation sentencing court failed to consider or did not adequately consider various factors is request that this Court substitute its judgment for that of lower court in fashioning appellant's sentence, which does not raise substantial question)). In addition, at sentencing, the court stated that it had the benefit of reading Alexander's pre-sentence report. *See* N.T. Sentencing, 11/15/19, at 2 (The court stated: "I have to admit I did not read each and every page of every misconduct because it became kind of redundant and just made me mad.").[6] Therefore, we assume that the court properly weighed Alexander's mitigating statutory factors. *See Devers*, *supra*. Finally, despite Alexander's claims to the contrary, the sentencing court **did** consider his need for therapy and treatment. *See* N.T. Sentencing, 11/15/19, at 14-16 (court observing that, in light of emotional trauma suffered by T.B.; T.B.'s inability to find refuge from Alexander on social media, at work, or at home; Alexander's inability to behave himself well while supervised; Alexander's resistance to mental health treatment; and Alexander's inability to comport his behavior to society's expectations, a

---

[6] Alexander accrued 31 misconducts while incarcerated and awaiting his sentence. *See* N.T. Sentencing, 11/15/19, at 11.

- 15 -

maximum sentence of incarceration is warranted). Consequently, Alexander has not shown that his sentence is unreasonable; thus, his discretionary aspects of sentencing claim fails. ***See*** 42 Pa.C.S.A. § 9781(c)(3). The trial court committed no abuse of discretion. ***See Blount, supra.***

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/22/21